# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CABLE & WIRELESS USA, INC., *et al.*, | Substantively Consolidated |
| Debtors. | Case No. 03-13711 (KJC) |
| AlixPartners LLC as Trustee of the Omega Liquidating Trust, | Case No. 1:05-CV-596 |
| Appellant, | |
| v. | |
| Austin CAD, *et al.*, | |
| Appellees | |

## <u>APPELLANT'S OPENING BRIEF</u>

WINSTON & STRAWN LLP
Eric E. Sagerman
Rolf S. Woolner
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Edmon L. Morton (No. 3856)
Margaret B. Whiteman (No. 4652)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

WINSTON & STRAWN LLP
Brian Y. Lee
101 California Street, Suite 3900
San Francisco, California 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Co-Counsel to Omega Liquidating Trust

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CABLE & WIRELESS USA, INC., *et al.*, | Substantively Consolidated |
| Debtors. | Case No. 03-13711 (KJC) |
| | |
| OMEGA LIQUIDATING TRUST, | Case No. 1:05-CV-596 |
| Appellant, | |
| v. | |
| AUSTIN CAD, *et al.*, | |
| Appellees | |

## <u>APPELLANT'S OPENING BRIEF</u>

WINSTON & STRAWN LLP
Eric E. Sagerman
Rolf S. Woolner
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone:  (213) 615-1700
Facsimile:  (213) 615-1750

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Edmon L. Morton (No. 3856)
Margaret B. Whiteman (No. 4652)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

WINSTON & STRAWN LLP
Brian Y. Lee
101 California Street, Suite 3900
San Francisco, California  94111
Telephone:  (415) 591-1000
Facsimile:  (415) 591-1400

Co-Counsel to Omega Liquidating Trust

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ............................................................ 1

STATEMENT OF THE STANDARD OF REVIEW .................................................. 2

STATEMENT OF ISSUES ON APPEAL .................................................................. 2

SUMMARY OF ARGUMENT .................................................................................. 3

STATEMENT OF FACTS ......................................................................................... 6

    A.    Procedural History. ....................................................................... 6

    B.    The Valuation Evidence in Question. ......................................... 9

    C.    Valuation Evidence Presented by Orange County. ................... 15

    D.    The Bankruptcy Court's Findings of Fact and Conclusions of Law .......................................................................................... 17

ARGUMENT ........................................................................................................... 18

I.    The Bankruptcy Court Erred in Holding That the Market Comparable Approach Was Not an Appropriate Valuation Methodology Authorized by the Taxing Authorities ........................... 18

II.    The Bankruptcy Court Erred In Applying a Per Se Rule Prohibiting Use of Bankruptcy Sales Data ............................................................ 22

III.    The Bankruptcy Court Erred In Relying on the Out-of-Court Barreca Statement ................................................................................... 24

IV.    The Bankruptcy Court Erred In Holding that the Debtors' Sale of Switches to Nortel Should Not be Considered in Determining the Value of Those Switches Because It Was Not a Retail Sale ............... 26

V.    Bankruptcy Court Erred In Excluding the PwC Study ...................... 30

VI.    The Bankruptcy Court Was Mistaken in Believing the Testimony of the Trustee's Valuation Expert Was Inconsistent with the Debtors' Prepetition Property Tax Renditions ..................................... 33

VII.    Orange County's Use of the C. A. Turner Index to Develop Assessments Was Not Appropriate ................................................... 34

CONCLUSION ........................................................................................................ 37

## TABLE OF AUTHORITIES

Page

### Cases

Alfred J. Sweet, Inc. v. Auburn
 180 A. 803 (Me. 1936) ............................................................................................... 23

Appeal of Secretary of Banking
 335 Pa. 226 (1946) ..................................................................................................... 24

Associates Commercial Corp. v. Rash
 520 U.S. 953 (1997) .................................................................................................... 30

Contrail Leasing Partners v. Consolidated Airways
 742 F.2d 1095 (7th Cir. 1984) ..................................................................................... 29

Crystal Ice Co. v. Commissioner
 14 BTA 682 (1928) ..................................................................................................... 27

Dean Taylor Cadillac-Olds, Inc. v. Thompson
 871 S.W.2d 5 (Mo. App. E.D. 1993) ........................................................................... 21

Estate of Kaplan v. Commissioner
 748 F.2d 1109 (6th Cir. 1984) ..................................................................................... 27

Ford Motor Credit Company v. Dobbins
 35 F.3d 860 (4th Cir. 1994) ......................................................................................... 22

FTC v. Nat'l Bus. Consultants, Inc.
 376 F.3d 317 (5th Cir. 2004) ....................................................................................... 26

Grabler Manufacturing Co. v. Kosydar, Tax Commr.
 330 N.E.2d 924 (Ohio 1975) ....................................................................................... 27

In re Art Shirt Ltd., Inc.
 93 B.R. 333 (E.D. Pa. 1988) ....................................................................................... 31

In re Ebbler Furniture and Appliances, Inc.
 804 F.2d 87 (7th Cir. 1986) ......................................................................................... 29

In re Fairchild Aircraft Corp.
 124 B.R. 488 (Bankr. W.D. Tex. 1991) .................................................................. 20, 23

In re Flores De New Mexico, Inc.
 151 B.R. 571 (Bankr. D. New Mex. 1993) ................................................................... 22

In re Japanese Electronic Products
 723 F.2d 238 (3d Cir. 1983) rev'd on other grounds, 106 S. Ct. 1348 (1986) ............. 32

In re Metromedia Fiber Network\
 299 B.R. 251 (Bankr. S.D.N.Y. 2003) .................................................................. 21, 22

In re The Kids Stop of America, Inc.
 64 B.R. 397 (Bankr. M.D. Fla. 1986) .......................................................................... 22

In re The Two "S" Corporation
  875 F.2d 240 (9th Cir. 1989).....................................................................................22

Nelson v. State Tax Comm.
  506 P.2d 437 (1973)..................................................................................................23

New Jersey Chamber of Commerce v. Hughey
  868 F.2d 621 (3d Cir. 1989).........................................................................................2

Rush v. JLJ Inc. (In re JLJ Inc.)
  988 F.2d 1112 (11th Cir. 1993).....................................................................................2

Salsman v. Witt
  466 F.2d 76 (10th Cir. 1972)......................................................................................26

Standard Bleachery & Printing Co. v. Borough of East Rutherford
  112 N.J.L. 81 (N.J. Ct. App. 1934)...........................................................................24

Town of Palm Beach v. City of West Palm Beach
  55 So. 2d 566 (Fla. 1951)..........................................................................................20

Treadwell Realty Co. v. City of Memphis
  116 S.W.2d 997 (Tenn. 1938)....................................................................................23

Withers v. Flagship Peoples Bank of Tallahassee
  473 So.2d 789 (Fla. 1st DCA 1985)...........................................................................27

**Statutes**

28 U.S.C. § 158(a) .........................................................................................................2

Bankruptcy Code § 505................................................................................................21

**Rules**

Federal Rule of Bankruptcy Procedure 9014 ..............................................................25

Federal Rule of Civil Procedure 43(a) ........................................................................25

Federal Rule of Evidence § 703 ..............................................................................31, 32

Federal Rule of Evidence§ 705 ...............................................................................31, 32

Local Bankruptcy Rule 9013-1(d) ..............................................................................25

**Other Authorities**

3 Collier on Bankruptcy
  ¶ 506.04[2] (15th ed. 2006)......................................................................................23

7 Moore's Federal Practice
  § 32.60 (Matthew Bender 3d ed.)..............................................................................26

Economics and the Rhetoric of Valuation
  5 J. Bankr. L. & Practice 3 (1995) ............................................................................28

Jean Braucher, Getting It For You Wholesale: Making Sense of Bankruptcy Valuation of
Collateral After Rash
  102 Dick. L. Rev. 763 (1998) ...................................................................................28

## NATURE AND STAGE OF PROCEEDINGS

This appeal arises from erroneous limitations by the bankruptcy court (Judge Peterson) on evidence that could be offered and considered to establish the fair market value of certain telecommunications equipment for property tax purposes.

Appellant is the trustee of the Omega Liquidating Trust (the "Trustee"), responsible for administering the liquidation of the bankruptcy estates of Cable & Wireless USA, Inc. and affiliated debtors (the "Debtors"). The Trustee objected to the claims of certain taxing authorities (the "Taxing Authorities") for 2003 property taxes on the Debtors' telecommunications equipment located in those jurisdictions. The Taxing Authorities had valued the assets using the "cost" approach to valuation, i.e., applying depreciation schedules to the original cost of the equipment. The Trustee's objections explained that this approach did not adequately account for the failure of many telecommunications companies in the early 2000s or the resulting glut of telecom assets in the market, with a corresponding effect on the value of used equipment. The resulting assessments thus overvalued the Debtors' equipment, greatly inflating the property tax claims.

The Trustee provided expert testimony that appraised the subject property at much lower values using an alternative valuation approach permitted in each jurisdiction: the "market comparable" approach, based on contemporaneous sales of similar property. The bankruptcy court, however, improperly limited the expert testimony the Trustee could offer. For example, the bankruptcy court ruled that the "market comparable" approach was inconsistent with permissible methodology in the different jurisdictions. The bankruptcy court compounded this mistake by refusing to consider any data concerning sales of equipment by companies in bankruptcy (including the sale of some of the property at issue

1

during the Debtors' bankruptcy case) on the basis that bankruptcy sales can <u>never</u> be arm's-length transactions between parties who are willing, but not forced, to sell or buy. These crucial errors led the bankruptcy court to bar consideration of much of the relevant data.

On June 24, 2005, the bankruptcy court entered a final order denying the relief sought in the Trustee's objections and issued a Memorandum of Opinion stating the reasons for its decision. The Trustee filed a timely notice of appeal.

This Court has jurisdiction under 28 U.S.C. § 158(a) to hear this appeal.

## STATEMENT OF THE STANDARD OF REVIEW

This appeal raises seven issues. The first five issues are questions of law, over which this Court has plenary review. <u>New Jersey Chamber of Commerce v. Hughey</u>, 868 F.2d 621, 629 (3d Cir. 1989). This Court owes no deference to the bankruptcy court's legal conclusions, but reviews them <u>de novo</u>. <u>Rush v. JLJ Inc. (In re JLJ Inc.)</u>, 988 F.2d 1112, 1116 (11th Cir. 1993).

The last two issues involve factual findings and are reviewed under an "abuse of discretion" standard and will be reversed if they are "clearly contrary to reason and not justified by the evidence." .

## STATEMENT OF ISSUES ON APPEAL

1.    Whether, in determining the value of personal property for property tax purposes, the bankruptcy court erred when it ruled that use of the market comparable approach to valuation (i.e., comparable sales) by the Trustee represented a "nationwide market value standard" that was "at variance with each state's methodology"?

2.    Whether the bankruptcy court erred when it prohibited use of bankruptcy sales data in an expert's valuation analysis on the ground that bankruptcy sales can never

be the result of an arm's-length transaction between parties who are willing, but not forced, to sell or buy?

3.      Whether the bankruptcy court erred when it relied in its ruling on a declaration of a purported expert who never testified in court as a witness?

4.      Whether the bankruptcy court erred when it concluded that the Debtors' prepetition sale of certain switches should be disregarded as evidence of the switches' fair market value because it was not a retail sale?

5.      Whether the bankruptcy court erred when it excluded portions of the Trustee's expert's testimony because the expert had considered certain non-public information, when that information had been made available (on a confidential basis) to those parties to the proceeding who requested it?

6.      Whether the bankruptcy court abused its discretion when it discredited the Trustee's expert testimony as inconsistent, on the basis that the expert (who had been a prepetition property tax advisor to the Debtors) had, in filing tax returns on behalf of the Debtors, provided information required by law relating to the original cost of the Debtors' property?

7.      Whether the bankruptcy court abused its discretion when it found the use by a taxing authority of the C.A. Turner Index to develop property tax assessments for the Debtors' used telecommunication equipment was appropriate (without any adjustment) in light of the market for such equipment in 2003?

## SUMMARY OF ARGUMENT

1.      Use of the market comparable approach to valuation for tax assessment purposes is consistent with the local methodology permissible in every jurisdiction

involved here. Although the Taxing Authorities typically use the "cost" approach when preparing assessments, because it is relatively simple and formula-driven, the cost approach is nowhere the only permissible approach. The Trustee was permitted in each relevant jurisdiction to use the market comparable methodology to establish that those assessments greatly overstated the actual value of the subject assets.

2.     The bankruptcy court flatly, and erroneously, prohibited use of bankruptcy sale data for valuation purposes. Research has revealed no case supporting the application of a blanket rule against consideration of information from bankruptcy sales. Whether a particular sale in a bankruptcy context is an arm's-length transaction between a willing seller and buyer must be determined on a case-by-case basis, not by application of a per se rule.

3.     The bankruptcy court erred in relying on the out-of-court statement of a purported expert who never testified in court. Consideration of that statement violated the live testimony requirement and the hearsay rule. The statement was originally filed by parties as to which the Trustee's objections were resolved before the hearing. The declarant was thus never called as a witness and never subjected to cross-examination. The bankruptcy court gave no indication that it nonetheless intended to consider that statement, so the Trustee did not address the matters raised in that statement in the course of the Trustee's presentation of evidence.

4.     The bankruptcy court erred in holding that the fair market value of equipment (here, switches) can be determined only by using retail sales. Applicable law does not impose such a requirement, and such a restriction conflicts with the willing seller and buyer test that underlies the market comparable approach. A willing buyer under no

compulsion to purchase would not pay retail prices for the Debtors' used switches when the Debtors were not offering services or benefits associated with retail sales.

5.      The bankruptcy court misapplied evidentiary rules to exclude testimony offered by the Trustee's expert that was based in part on a non-public study. Experts routinely consider information subject to confidentiality limitations, and information need not be admitted (or even admissible) to be appropriate for expert analysis. Here, the study the expert considered had been made available in advance of the hearing (on a confidential basis) to those parties to the proceeding who requested it, enabling any party who wished to cross-examine the expert about the study to do so.

6.      The bankruptcy court mistakenly concluded that testimony from the Trustee's expert that the market comparable approach was the most appropriate method to value these assets was inconsistent with prepetition property tax returns the same individual had filed on behalf of the Debtors. Information as to the original cost of assets had been provided in prepetition tax returns (renditions) he filed as a consultant to the Debtors. That cost information was provided because it was <u>required</u> by local law, not because the consultant was somehow endorsing use of the cost approach to value the subject assets.

7.      The bankruptcy court's finding that the unadjusted C.A. Turner Index (used by Orange County, Florida) was a valid estimate of the fair market value of the Debtors' used switches was clearly contrary to the weight of the evidence. That index tracks what it would cost to replaced used telecommunications equipment by purchasing <u>new</u> ones of the same make and model at retail; it does not track what it would cost to purchase used equipment, such as the assets here. Nor does the index account for economic obsolescence

of used telecommunications equipment, a critical factor at the time in question. The bankruptcy court's acceptance of the C.A. Turner Index without any adjustment for these and other factors identified at the hearing was an abuse of discretion.

## STATEMENT OF FACTS

### A.    Procedural History.

The Debtors provided Internet web hosting and network services throughout the United States. They filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 8, 2003. (A0003-04)    Shortly thereafter, the bankruptcy court authorized the sale of substantially all of the Debtors' assets pursuant to an asset purchase agreement with Savvis, Inc. following a competitive auction under section 363 of the Bankruptcy Code. (A0279-0309; A0313-31)

Under the Debtors' Third Amended Joint Plan of Liquidation (the "Plan"), confirmed in July 2004, the Trust was authorized to litigate claims on behalf of or against the Debtors' bankruptcy estates. (A0585-86)

On March 5, 2005, the Trustee filed its Fifteenth and Sixteenth Omnibus Objections (the "Objections") to reduce the Taxing Authorities' 2003 property tax claims. (A0644-0777) The Objections were based on expert testimony that the disputed property tax assessments substantially overvalued certain assets (consisting primarily of switches used to provide long-distance phone service and a national underground fiber network). The Taxing Authorities had used a cost approach (i.e., original book value minus predetermined depreciation schedules) in valuing the assets.    The Trustee's expert explained that in the early years of this decade many telecom companies had failed or were failing; there was a glut of used telecom assets. (A0698-99; A0765-66; A1710-11)  As a

result, the cost approach used by the Taxing Authorities did not properly account for the oversupply of such assets at the time and the depressing effect on the value of used telecom assets. (A0698; A0765; A1707)

The Trustee's expert, Don Schmitt, is a professional with decades of experience in the taxation of telecommunications assets. As he explained, each of the Taxing Authorities permits a taxpayer to establish value for property tax purposes in specified alternative ways where appropriate. (A697-98; A764-65; A1698-1700) Taxpayers are not limited to use of the cost approach. Each jurisdiction also permits a taxpayer to establish value by using the "market comparable" approach, which involves the presentation of data pertaining to sales of similar assets to determine the fair market value of such assets.

According to Mr. Schmitt, the market comparable approach was the most appropriate valuation method under the circumstances. (A0698-99; A0765-66; A1316-17; A1699) He considered various sources of information concerning sales of used telecommunications switches and fiber, including sales occurring in the context of bankruptcy cases involving telecom companies. That information led him to conclude that the fair market value of the assets in 2003 was a fraction of the assessments prepared using original cost. (A0699-0702; A0766-69; A1317)

On April 6, 2005, the bankruptcy court granted relief in favor of the Trustee with respect to those jurisdictions that did not file a response (A1328-40; A1949-57), but continued the Objections with respect to others to May 5 (A1321-40). On April 21, the bankruptcy court issued an order making preliminary rulings in favor of the Trustee on a number of procedural, jurisdictional, and sovereign immunity arguments that had been raised by certain Taxing Authorities. (A1440-60) But the order also contained

preliminary rulings that the use of the comparable sale approach by the Trustee's expert would be "at variance with each State's methodology," and that the use of bankruptcy liquidation sales data in valuing the Debtors' assets would not be permitted. (A1452-55)

In light of the bankruptcy court's view that the market comparable approach was not consistent with the different authorities' methodology, the Trustee submitted a supplemental brief showing, among other things, that use of the market comparable approach as a valuation technique was permitted by every Taxing Authority involved in the Objections.    (A1467-72)    The supplemental brief further explained that sale transactions should be examined on a case-by-case basis to see if they satisfy the willing seller/buyer test, and that appropriate sales in the context of bankruptcy proceedings may be considered when using that approach. (A1475-77)

On the evening before the May 5, 2005 hearing, certain Florida taxing authorities (the "Florida Authorities") filed a declaration of Stephen Barreca (the "Barreca Statement"), offered as expert testimony. (A1559-94)  The Barreca Statement asserted, among other things, that there was no market depression in the telecommunications industry in 2003. (A1564-65)

At the May 5th hearing, because the Trustee had not been notified of Mr. Barreca's testimony or given an opportunity to depose him, the bankruptcy court continued the hearing on the Objections with respect to the Florida Authorities and also Orange County, Florida, to June 15. (A1678-79)

The bankruptcy court did, however, proceed on May 5 to hear evidence on the Objections as to the other Taxing Authorities.  The bankruptcy court declared that no bankruptcy sales would be considered, as a matter of law. (A1676)  It also excluded the

portion of the Trustee's expert testimony based on an appraisal study because that study was non-public information that was not itself admitted in the record at the hearing. (A1745-46; A1973)  Prior to the hearing, the Trustee had made the non-public study available to any parties who wished to examine it and who agreed to keep the information confidential. (A1745-46)  None of the Taxing Authorities presented any witnesses at the May 5th hearing. (A1670-A1753)

Prior to the scheduled June 15th hearing, the Trustee resolved its dispute with the Florida Authorities and withdrew its objection to their claims. (A1990)  As a result, their proposed witness, Mr. Barreca, was never presented as a witness in the proceeding.

This left Orange County, Florida, as the only taxing authority whose claim was still in dispute. (A1990)  At the June 15, 2005 hearing, counsel for Orange County cross-examined the Trustee's expert (A2009-31), and presented a witness to explain the process by which Orange County had valued the Debtors' assets. (A2033-49)

On June 24, 2005, the bankruptcy court entered an order denying the relief sought in the Objections (A1985) and issued a Memorandum of Opinion stating the reasons for its decision. (A1958-84)  The Trustee appealed.  (A2071-76)

The mandatory mediation process that followed the filing of the appeal informally resolved the appeal as to 116 jurisdictions, leaving as parties to this appeal only five Taxing Authorities, only one of which, Orange County, has a claim of material size.

**B.    The Valuation Evidence in Question.**

The assets at issue consist primarily of (i) switches and related equipment used to provide long-distance phone services and (ii) a national underground fiber network.  The

Debtors' saleable switches were sold prior to the bankruptcy, in February 2003; the fiber network was part of the assets sold to Savvis in January 2004.

### 1.    The Trustee's Expert Witness on Valuation

The analysis of the fair market value of these assets as of January 1, 2003 (the valuation date for 2003 property tax) was presented by Don Schmitt. Mr. Schmitt has been involved in the telecommunications industry, as an employee or a consultant, for roughly 35 years. (A0695-97; A0762-64; A1681) He spent the last 28 years specifically in the field of property tax and assessment valuation issues. (A1681) As a tax manager or tax director for various telecommunications companies over many years, he prepared numerous valuation reports for property tax purposes and assisted in the preparation of many more appraisal reports. (A1682)

In 1991 he formed his own tax consulting practice, focusing on telecommunications taxes, including property tax issues. (A0696-97; A0763-64) As a consultant, he provided services to the Debtors for a dozen years prior to the their bankruptcy filings, becoming very familiar with the Debtors' assets and the locations where the Debtors were operating. (A1682)

Over the years, Mr. Schmitt has dealt with all of the Taxing Authorities regarding property tax issues. (A1684) He has extensive familiarity with the requirements of those jurisdictions for property taxes and the applicable standards and procedures for valuation of property. (A1685-86) Mr. Schmitt spends a majority of his time in the property tax field, filing returns and negotiating assessment values. (A1686) Approximately a third of his time as a consultant is spent on telecommunications valuation and related issues.

(A1691)  He has handled approximately a thousand formal or informal challenges to property tax assessments based on valuation issues. (A1684)

### 2.    The Value of the Switches

Mr. Schmitt's analysis of the value of the Debtors' switches focused (i) on the prepetition sale of the very switches at issue by the Debtors to Nortel in February 2003, within weeks of the valuation date for 2003 property tax, and (ii) on sales of other switches by other sellers in the same general period.

#### a.    The Nortel Sale

In 2002 the Debtors decided to leave the long distance phone market and sold that division of their business to Primus Telecommunications.  (A0700; A0767; A1711; A1999-A2000)  Primus had its own switches and did not need the Debtors' switches. (A1711; A1999)  Accordingly, the Debtors marketed their switches starting in November 2002. (A1711; A1999)  At least three bids were received (A1711; A1999), all offering fairly similar prices for the switches, but Nortel's bid was deemed the best because it offered to purchase the most switches. (A1711-12; A1999)  The sale to Nortel closed in February 2003.  (A1712; A1999)  Mr. Schmitt used the actual selling prices for the switches sold by the Debtors when analyzing the value of the switches.  (A1716-17; A1627; A1636; A1716)

#### b.    The Teligent Sales

Mr. Schmitt also examined a series of sales of switches by another telecom company, Teligent, during its chapter 11 bankruptcy in 2002.  Teligent was leaving the local exchange business to focus on other services. (A1714)  It therefore wanted to sell its assets relating to that business. (A1714)  An offer of proof was made that, if permitted to

do so by the bankruptcy court, Mr. Schmitt would testify that Teligent engaged a broker of used switch assets to market and sell all of its switches located in multiple locations, and that over the course of 2002 Teligent had solicited and negotiated 16 separate sales (involving 21 switches), the prices of which were all similar to the prices obtained by the Debtors' sales to Nortel a few months later. (A1713)  Mr. Schmitt had been Teligent's property tax advisor and learned of the circumstances surrounding the Teligent switch sales from the person responsible for negotiating those sales. (A1713)

### c.    *Mr. Schmitt's Valuation Conclusion*

Based on the market comparable information he had analyzed, Mr. Schmitt concluded that the actual sale prices obtained from the sale to Nortel represented the fair market value of the Debtors' switches as of January 1, 2003. (A1716)  On that basis, he concluded that the assessment of the Debtors' switch located in Orange County (the only remaining appellee that had a switch within its jurisdiction) should be reduced from $3,923,337 to approximately $310,656. (A0687)

### 3.    The Value of the Fiber Network

Mr. Schmitt's analysis of the value of the Debtors' fiber assets was based on (i) the Debtors' sale of their fiber network to Savvis, Inc. in January 2004, (ii) a valuation study prepared in connection with the Debtors' sale to Savvis, (iii) sales of similar fiber networks in the Telergy and eSpire bankruptcies, (iv) other fiber appraisal studies, and (v) Schmitt's communications with knowledgeable industry insiders.

### a.    *The Sale to Savvis*

The Debtors' fiber network was among the assets sold to Savvis pursuant to the asset sale overseen by the bankruptcy court in January 2004. (A0313-31)  That asset sale

was the culmination of months of effort. Following a decision in 2003 by the Debtors' corporate parent to exit the U.S. market (A0007), the Debtors commenced an intensive process to market their assets. (A0010-11) Working with an investment banker, nearly a hundred expressions of interest in the Debtors' business (A0010-11; A084-87) led to an agreement in early December 2003 for the sale of substantially all of the Debtors' assets for $125 million, partly in cash and partly in a note subject to adjustment based on performance. (A0011; A0427) As a condition of the sale, the prospective purchaser required the Debtors to conduct the sale through chapter 11. (A0011) This meant the offer would be subject to a competitive auction in bankruptcy. The Debtors filed chapter 11 petitions on December 8, 2003 and on December 22 obtained approval to conduct an auction of their assets as a going concern. (A0279-0309)

The auction took place on January 21-22, 2004. (A0313-31) Multiple bidders submitted bids. (A0318; A0410) At the conclusion of the bidding, Savvis (which was <u>not</u> the prospective purchaser originally identified through the marketing process) had made the highest offer at $155 million in cash, plus the assumption of many millions more in liabilities. (A0332-0403) The bankruptcy court found that the sale to Savvis was the highest and best offer for the assets and that Savvis negotiated the terms and conditions of the sale in good faith and at arm's length. (A0317-18)

       *b.*     *The PwC Study*

Following the sale to Savvis, PricewaterhouseCoopers ("PwC") was engaged to prepare a price allocation report (the "PwC Study") allocating the purchase price among the assets acquired. (A1723-24) Among other things, PwC appraised the fiber network using an analysis of Reconstruction Cost New ("RCN") – that is, an analysis of the

estimated <u>cost</u> to reconstruct a similar fiber network. (A1723-24) The RCN analysis in effect represents a cap on value, since a prospective purchaser would build rather than buy if the price of an asset exceeded the RCN. (A1723-24) Based on this RCN analysis, the PwC Study concluded that the fair market value of the Debtors' fiber network was $245 per fiber mile. (A1724)

Following the PwC Study, all of the Taxing Authorities involved in this appeal accepted the PwC Study's price allocation analysis of the Savvis sale for purposes of establishing the fair market value of the fiber assets for 2004 property tax purposes. (A0701-02; A0768-69) Mr. Schmitt testified that there were no material changes in the telecommunications equipment market between January 2003 and January 2004, so that the RCN as of 2003 would have been essentially the same as the value determined a year later by the PwC Study. (A1724; A0701-02; A0768-69)

c.    *Bankruptcy Sales*

Mr. Schmitt also examined sales of fiber networks by two telecom companies, Telergy and eSpire, in 2002 in their chapter 11 bankruptcy cases. (A1717-18) Telergy's sale to Dominion Telecom represented a value of $41 per fiber mile, while eSpire's sale to Xpedius in June 2002 yielded $305 per fiber mile. (A1718) Both sales involved "long-haul" fiber networks similar to those owned by the Debtors. (A1717-18) Mr. Schmitt learned of the circumstances surrounding the Telergy and eSpire sales from his review of their Form 10K and 10Q reports filed with the SEC and from discussions with participants involved in those bankruptcy cases. (A1719-20)

### d.    Other Appraisals

Mr. Schmitt also reviewed and identified appraisal studies with which he was familiar that had been prepared by Deloitte & Touche and Standard & Poor's of the fair market value of long haul fiber as of January 1, 2002, and January 1, 2003. (A1721) Both appraisal studies valued used such assets at approximately 15% of original value; the same formula, when applied to the fiber assets here, would indicate a value of approximately $225 per fiber mile. (A1721)

### e.    Discussions with Industry Insiders

Finally, Mr. Schmitt testified to his discussions with knowledgeable individuals in the telecommunications industry, including at Qwest Communications and Level 3, two of the major sellers, builders, and constructors of fiber networks. (A1722-23) All of them confirmed that the telecommunications industry was in a slump in the period 2002-2004, and that it was cheaper to rent long haul fiber than to own it. (A1723)

### f.    Mr. Schmitt's Valuation Conclusion

Based on all of these indicators of value, in Mr. Schmitt's opinion, the $245 per mile of the PwC Study was an appropriate reflection of the value, based on a market comparable approach, of that fiber in January 2003. (A1724-25) This meant, for example, that the assessment of the fiber in Orange County should be reduced from approximately $1,353,976 to approximately $75,000. (A0687)

### C.    Valuation Evidence Presented by Orange County.

There was testimony at the June 15 hearing by Thomas Diffey on behalf of Orange County concerning its use of the C.A. Turner Index to develop assessments for the Debtors' equipment. Mr. Diffey, an assessor for Orange County, explained that C.A.

Turner, the company that develops the index, collects from the major telephone companies information regarding what they are paying for their <u>new</u> telecommunications equipment and compares the prices for the same equipment the prior year to develop an index that allow a user to estimate what it would cost to replace used telecommunications equipment by purchasing <u>new</u> ones of the same make and model at retail. (A2045-46; A2050)

Under cross-examination, however, Mr. Diffey conceded that the C.A. Turner Index does not track what it would cost to purchase <u>used</u> telecommunications equipment, such as the Debtors' assets, in the market. (A2050) Mr. Diffey also acknowledged that the Index does not account for economic obsolescence of used telecommunications equipment.[1] (A2050) In that connection, Mr. Diffey further acknowledged during the period 2001 to 2004 many telecommunications companies in Orange County went bankrupt, went out of business, or were acquired. (A2051) He conceded that in 2004 he had to reduce some assessments calculated from the C.A. Turner Index by as much as 40% to 60% to account for economic obsolescence; he could not recall whether he made similar adjustments in 2003. (A2055-57)

Mr. Diffey acknowledged that Orange County had accepted the price obtained in the Savvis sale as evidence of the fair market value in 2004 of the subject property, because the sale was a commercially reasonable sale that satisfied the willing seller/buyer test. (A2058-60) Because of Orange County's adjustment, the assessment went from approximately $1.4 million in 2003 (calculated using the C.A. Turner Index) to $75,000 in 2004 — a drop of over 90% in a single year. (A0687) Yet the unrebutted testimony of the

---

[1]    Economic obsolescence is a loss in value that results from external factors, such as a drop in demand for, or an oversupply of, used equipment in the market, that render a property obsolete, no longer competitive, unattractive to purchasers or investors, or of decreasing usefulness. (A2049-A2050)

Trustee's expert was that the value of used telecom assets remained stable in that period. (A2002)

### D.    The Bankruptcy Court's Findings of Fact and Conclusions of Law.

In denying the Trustee's Objections, the bankruptcy court excluded virtually all of the Trustee's valuation evidence and concluded the Trustee's expert had not presented reliable, credible evidence.

The bankruptcy court rejected Mr. Schmitt's use of the market comparable approach as a "nationwide market value standard" that would be contrary to the valuation methodology sanctioned by the Taxing Authorities. (A1971) It concluded that "the debtor must apply state law, not national standards. [The bankruptcy court] see[s] nothing in the Schmitt testimony that satisfies local assessment standards." (A1971)

The bankruptcy court accused Mr. Schmitt of flip-flopping. Mr. Schmitt testified that he had been a property tax advisor to the Debtors and had, in filing prepetition tax returns ("renditions") on behalf of the Debtors, provided information required by law relating to the original cost of the Debtors' property. (A1698-1706) The bankruptcy court thought that, in providing such cost information, Mr. Schmitt had sanctioned the cost approach to valuation (A1700-03), so that his testimony in favor of the market comparable approach somehow contradicted his earlier position. (A1700-03)

The bankruptcy court rejected the prices realized from the Savvis sale, as well as other comparable sales from the Teligent, eSpire, and Telergy bankruptcies, because those transactions occurred in a bankruptcy context. (A1676-77) The bankruptcy court held that bankruptcy sales can <u>never</u> be arm's-length transactions between parties who are willing, but not forced, to sell or buy. (A1676-77)

The bankruptcy court relied on the out-of-court Barreca Statement in concluding (a) that sales involving a bankruptcy do not meet the willing seller test because there is an element of compulsion in such a sale transaction; (b) that the telecommunications market was not depressed in 2003; and (c) that the Debtors' sale of switches to Nortel should be rejected because it was not a retail sale.  (A1973)  Prior to its ruling, the bankruptcy court had given no indication it would consider the Barecca Statement at all.

The bankruptcy court excluded the testimony based on the PwC Study because it was not public information that was admitted into evidence.  (A1973; A1745-46)

Finally, after excluding all of the Trustee's evidence, the bankruptcy court found use of the C.A. Turner Index by Orange County to appraise the value of the Debtors' assets in 2003 was appropriate in light of the telecommunications market.  (A1973)

## ARGUMENT

### I.  The Bankruptcy Court Erred in Holding That the Market Comparable Approach Was Not an Appropriate Valuation Methodology Authorized by the Taxing Authorities

The bankruptcy court ruled that the market comparable analysis of value represented a "nationwide appraisal standard" that was "at variance with each State's methodology, and thus [was] not an appropriate valuation standard." (A1971)  The bankruptcy court further concluded that Mr. Schmitt's use of the market comparable approach over the cost approach "sets local uniformity of tax assessment and tax on its head." (A1971)

The bankruptcy court appears to have concluded, incorrectly, that only one methodology was permissible in each jurisdiction, and that the Taxing Authorities had in each case authorized only the cost approach.  The bankruptcy court's belief that the relief

requested by the Trustee was inconsistent with local methodologies reflects a misunderstanding of both the Trustee's valuation approach and the methodologies permissible in each jurisdiction.

It is true that the market comparable approach is one of three methodologies generally recognized around the country as standard approaches to valuation. It is <u>not</u> true, however, that the Trustee asserted that there is a nationwide appraisal standard for property tax that should somehow be binding on all the Taxing Authorities. Rather, the separate rules of every Taxing Authority <u>all</u> permit use of the market comparable approach to determine value for property tax purposes. It is appropriate to refer to a single standard for the jurisdictions at issue only in the sense that those jurisdictions have each separately determined that the market comparable approach to valuation is permissible — not the <u>only</u> acceptable approach, but <u>an</u> acceptable approach in each jurisdiction.

This conclusion is demonstrated by a table the Trustee compiled for the bankruptcy court, listing applicable statutes, case law, and/or practice guidelines in each of the relevant jurisdictions regarding permitted valuation techniques and methodologies. (A1468-71) Without exception, the fair market value standard is the valuation standard according to each jurisdiction's laws and local practices. Without exception, each jurisdiction recognizes the market comparable approach to valuation as a permissible valuation technique.

The fact that tax authorities typically use the cost approach (a relatively simple, formula-driven method of valuation) when preparing assessments does not prevent a taxpayer from asserting that the market comparable approach is a more appropriate method under the circumstances. <u>Both</u> approaches are permissible; the issue, as Mr. Schmitt

explained, is whether there is reason to use one approach rather than the other where they yield different results. (A1274-76)

As Mr. Schmitt testified, in using the cost approach, the Taxing Authorities generally followed pre-determined depreciation schedules that did not account for the reduced market values of used telecom assets in the early years of this decade. As a result, use of the cost approach resulted in grossly excessive valuation of the property at issue. Using the market comparable approach, as permitted in each jurisdiction, corrects this problem. (A0698-99; A0765-66)

In discussing the need to apply local law to determine local property tax, the bankruptcy court raised a concern about "uniformity of assessment." (A1972) This issue was addressed in In re Fairchild Aircraft Corp., 124 B.R. 488 (Bankr. W.D. Tex. 1991). In Fairchild, the chapter 11 trustee moved for a re-determination of the debtor's prepetition property tax liabilities on the basis that the tax assessments, based primarily on book values, had been excessive relative to the property's fair market value. The taxing authorities argued that the court should abstain from such a re-determination to avoid non-uniformity of assessment. The court rejected the argument:

> If the tax *rate* were the subject of this motion, perhaps abstention might be appropriate. Because the trustee only challenges the excessiveness of the appraisal district's valuation of the estate's property, the taxes to be paid by other taxpayers will not be affected, nor will uniformity of assessment be placed in issue (i.e., the overall valuation methodology used by the appraisal district is not being generally attacked). Because uniformity of assessment is not an issue, the taxing authorities' argument on this point must be rejected.

124 B.R. at 491-92. See also Town of Palm Beach v. City of West Palm Beach, 55 So. 2d 566, 571 (Fla. 1951) (Florida constitutional requirement for uniformity of taxation requires equal *rate* of taxation be uniformly applied throughout the state); Dean Taylor Cadillac-

Olds, Inc. v. Thompson, 871 S.W.2d 5, 6 (Mo. App. E.D. 1993) (Missouri constitutional requirement of uniformity refers to the measure, gauge, or rate of tax).

Here, the Trustee did not challenge the tax rates, did not seek to change the system of valuation methodologies approved by state law or local practices, and did not ask the bankruptcy court to exempt the Debtor's assets from local taxes that other taxpayers in the same jurisdiction are required to pay. Therefore, no issues concerning uniformity of assessment are implicated here.

In re Metromedia Fiber Network, 299 B.R. 251 (Bankr. S.D.N.Y. 2003), which the bankruptcy court quoted in raising the issue of potential non-uniformity of treatment, was a very different kind of proceeding than the one here and posed unique reasons for concern. In Metromedia, the debtor in effect sought to enjoin the local property tax assessment, determination, and collection processes "on an ongoing basis." Id. at 276-77 (emphasis added). As noted, taxing authorities typically prefer to use the cost approach initially to make assessments and collect taxes on that basis, allowing the taxpayers to challenge the assessments afterward if they disagree with the assessed values. In Metromedia, however, the debtor sought to enjoin taxing authorities from assessing taxes using the cost approach because it believed the cost approach would necessarily inflate the assessments and result in excessive taxes. The injunction sought in Metromedia would have disrupted the process by which taxes were assessed, collected, and appealed beyond what is permissible under Bankruptcy Code section 505 by preemptively restricting the way the taxing authorities could assess the debtor's property on an ongoing basis, resulting in non-uniform treatment among taxpayers.

Here, the Trustee's Objections presented no such concern. The Trustee objected to assessments for a single <u>prior</u> year that overstated the value of the property at issue, and sought to revise those valuations based on an approach each jurisdiction would have permitted any other taxpayer to use in challenging tax assessments for the same year. Issues relating to uniformity of assessment raised in <u>Metromedia</u> do not apply here.

## II.    The Bankruptcy Court Erred In Applying a Per Se Rule Prohibiting Use of Bankruptcy Sales Data

The bankruptcy court prohibited, as a matter of law, consideration of bankruptcy sales in a market comparable analysis on the ground that bankruptcy sales can never be the result of an arm's-length transaction between parties who are willing, but not forced, to sell or buy. There is no legal support for such a categorical rejection of bankruptcy sales data in valuation of property, regardless of the circumstances of such sales.

Courts have held that, even in a bankruptcy context, the actual sale price of an asset is the best evidence of that asset's fair market value, so long as the sale price was the result of a commercially reasonable, arm's-length transaction between a willing seller and willing buyer. <u>E.g.</u>, <u>Ford Motor Credit Company v. Dobbins</u>, 35 F.3d 860, 870 (4th Cir. 1994) (price paid at commercially reasonable bankruptcy sales is best evidence of value); <u>In re The Two "S" Corporation</u>, 875 F.2d 240, 243 (9th Cir. 1989) (value of equipment was conclusively determined by sale price in debtor's postpetition sale); <u>In re The Kids Stop of America, Inc.</u>, 64 B.R. 397, 401 (Bankr. M.D. Fla. 1986) (if there is a disposition of the property, "then the valuation of the collateral should be based on the funds received from the disposition as long as the disposition was commercially reasonable"); <u>In re Flores De New Mexico, Inc.</u>, 151 B.R. 571, 576 (Bankr. D. New Mex. 1993) (price paid at commercially reasonable bankruptcy sale was best evidence of value of debtor's assets); <u>In</u>

re Otis Lee Boyer, 141 B.R. 214, 217 (Bankr. D. Kan. 1992) (actual consideration received is best evidence of value for property sold); In re Fairchild Aircraft, 124 B.R. at 499 (finding postpetition purchase price from sale of debtor's business best evidence of fair market value for property tax assessment purposes).

Indeed, the leading bankruptcy treatise has observed that bankruptcy sales that satisfy the willing seller/buyer test should be used as the basis to determine the assets' fair market value:

> If an actual disposition is to occur, regardless of the purpose of the valuation, the value of the collateral should be based on the consideration to be received by the estate in connection with the disposition, provided that the court determines such consideration is fair and was arrived at on an arm's-length basis. Inasmuch as the price and related terms of the disposition will indicate the value of the property to be disposed of, valuation should not be a substantial issue in the context of such an actual disposition.

3 Collier on Bankruptcy ¶ 506.04[2] (15th ed. 2006).

In its ruling here, the bankruptcy court cited Nelson v. State Tax Comm., 506 P.2d 437 (1973), and 89 A.L.R.3d 1126, §§ 6 and 7(b) (Receiver's Sale), as support for its categorical rejection of the use of bankruptcy sales. Nelson, however, merely commented that the price paid by a taxpayer for property in a bankruptcy sale "does not necessarily show conclusively what its valuation should be," but had to be viewed in light of the total circumstances. 506 P.2d at 440 (emphasis added). Similarly, the cases cited in the A.L.R. indicate that the price for property purchased in a receiver's sale is not necessary conclusive evidence of fair market value, but must be considered in the totality of the circumstances. Treadwell Realty Co. v. City of Memphis, 116 S.W.2d 997, 1000 (Tenn. 1938); Alfred J. Sweet, Inc. v. Auburn, 180 A. 803, 805 (Me. 1936); Standard Bleachery &

Printing Co. v. Borough of East Rutherford, 112 N.J.L. 81, 81 (N.J. Ct. App. 1934);
Appeal of Secretary of Banking, 335 Pa. 226, 229-231 (1946).

The cases cited by the bankruptcy court actually support the Trustee's case-by-case approach that considers the totality of the circumstances of each sale. They also support the principle that the actual sale price of property is at least a relevant, if not conclusive, indicator of that property's fair market value. Indeed, virtually all of the Taxing Authorities have accepted the sale to Savvis as a commercially reasonable, arm's-length transaction that met the willing seller and buyer test. (A0701-02; A2058-60) Despite that fact, the bankruptcy court categorically rejected as relevant evidence all data relating to the Debtors' sale of the very property at issue to Savvis, as well as other chapter 11 sales during the same period, as a matter of law. Bankruptcy sales represent a significant component of the available, relevant data of the fair market value of telecom assets at that time, because of larger trends in the economy and in the telecom industry. The bankruptcy court's refusal to allow consideration of such data necessarily skewed any conclusion as to value.

### III.    The Bankruptcy Court Erred In Relying on the Out-of-Court Barreca Statement

The bankruptcy court's Memorandum of Opinion impermissibly relied upon the Barreca Statement, citing it as a basis for questioning Mr. Schmitt's testimony concerning the relevance of bankruptcy sales, the state of the telecommunications market in 2003, and the significance of the Debtors' sale of switches to Nortel as the best indicator of their fair market value. (A1973) Despite the bankruptcy court's reliance upon his declaration, Mr. Barreca never appeared in court, was never qualified as an expert on any subject, and was

never cross-examined by the Trustee's counsel.   Consideration of the Barreca Statement was therefore improper in at least two respects.

First, it violated the live testimony requirement of Rule 43(a) of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 9014, which provides in pertinent part, "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Congress or by these rules, the Federal Rule of Evidence, or other rules adopted by the Supreme Court." Fed. R. Civ. P. 43(a) (emphasis added).   This mandate is echoed in Local Bankruptcy Rule 9013-1(d) for the District of Delaware, which provides that the live testimony requirement may be sidestepped only if the parties so stipulate: "At any evidentiary hearing, evidence shall be presented by live witnesses unless the parties submit a stipulation of facts or agree otherwise." Bankr. L.R. 9013-1(d).

There is nothing in the record here to suggest that any of the exceptions to Rule 43(a) apply here.  Nor did the parties agree to have evidentiary matters resolved through affidavits or declarations, or stipulate to any facts asserted in the Barreca Statement.  Live testimony was mandatory; it was not subject to the bankruptcy court's discretion.[2]   The bankruptcy court used the Barreca Statement in disregard of these rules.

Second, the Barreca Statement was hearsay.  It was filed by parties as to which the Trustee's Objections were resolved prior to the scheduled hearing on the claims of those jurisdictions, so Mr. Barreca was never produced as a witness for examination or cross-examination.  The Barreca Statement is thus a classic out-of-court statement on which the bankruptcy court relied for the truth of the matters asserted. FTC v. Nat'l Bus. Consultants,

---

[2]    The live testimony requirement may be modified to permit telephone or video testimony under appropriate circumstances and with sufficient safeguards.  For example, Mr. Diffey, Orange County's witness, testified telephonically without objection by the Trustee.  (A2032)

Inc., 376 F.3d 317, 322 n.9 (5th Cir. 2004) (affidavits are hearsay under Federal Rule of Evidence 801).

Because the bankruptcy court relied on matters asserted in the Barreca Statement without ever informing the parties of its intention to do so, the Trustee was not alerted to the need to present evidence on those matters after the parties who had filed that statement were no longer involved in the proceeding. More fundamentally, there was no admissible evidentiary support anywhere in the record for the matters on which the bankruptcy court relied on the Barreca Statement, so consideration of this hearsay affected the Trustee's rights and the integrity of the hearing. See also 7 Moore's Federal Practice, § 32.60 (Matthew Bender 3d ed.) ("In a bench trial, the judge may not base his or her findings on depositions that are on file but that were not introduced into evidence, even though they could have been introduced"); Salsman v. Witt, 466 F.2d 76, 77 (10th Cir. 1972) (in non-jury trial use of deposition not introduced into evidence, and findings by judge based at least in part on deposition, was improper and reversible error).

The findings of fact and conclusions of law made by the bankruptcy court in reliance on the Barreca Statement must be vacated.

### IV. The Bankruptcy Court Erred In Holding that the Debtors' Sale of Switches to Nortel Should Not be Considered in Determining the Value of Those Switches Because It Was Not a Retail Sale

The Trustee presented evidence as to the sale of the very switches at issue by the Debtors to Nortel in February 2003 as the best indicator of those same switches' fair market value on January 1, 2003. The switches had been marketed starting in late 2002 and the sale to Nortel as high bidder was literally pending on the valuation date. The sale closed in February, just a few weeks after the valuation date.

The actual sale price of an asset has long been regarded as the best evidence of that asset's fair market value (evidence corroborated by Mr. Schmitt's testimony about other contemporaneous sales of used switches). E.g., Estate of Kaplan v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984) (court highlighting price paid for subject property after valuation date; "[i]n determining the fair market value, little evidence would be more informative than the direct sale of the property in question"); Withers v. Flagship Peoples Bank of Tallahassee, 473 So.2d 789, 791 n.1 (Fla. 1st DCA 1985) (actual sale price at foreclosure sale presumed to be fair market value of property sold); Grabler Manufacturing Co. v. Kosydar, Tax Commr., 330 N.E.2d 924, 925-27 (Ohio 1975) (parent sold subsidiary with continuing losses; court held actual sale price was best evidence of the subsidiary's fair market value); Crystal Ice Co. v. Commissioner, 14 BTA 682, 685-686 (1928) (price in sale of property within month after valuation date was "very positive evidence of fair market value").

Here, however, the bankruptcy court held that the sale to Nortel, which closed within a few weeks of the property tax valuation date, could not be considered in determining the fair market value of the Debtors' used switches because the Barreca Statement asserted that "it was not a sale at retail" and that fair market value must be measured at the retail level. Even setting aside the problem that any reliance on the Barreca Statement was improper, this position is supported by neither law nor reasons.

First, none of the jurisdictions involved here, including Florida, requires fair market value be measured at the retail level. As explained in Part I above, the standard for a market comparable approach to valuation (accepted by every jurisdiction party to this appeal) is the willing seller and buyer test. There is no requirement purporting to restrict

the basis of a fair market value assessment only to retail prices. The bankruptcy court's apparent belief in the existence of such a requirement reflects an incorrect understanding of the applicable law. The bankruptcy court had no basis to reject the Nortel sale as evidence of value because it was not a retail sale.

Second, the distinction between retail and wholesale value, on which that aspect of the bankruptcy court's holding was premised, is an artificial one that has no economic basis and has long been rejected by economists and courts alike when applying valuation theory to determine the fair market value of property. As Professors Lawless and Ferris observe in their article Economics and the Rhetoric of Valuation, retail prices tend to be higher than wholesale prices not because the same property could have two different values, but because retail prices include value-adding activities by the retailers (such as the costs of inventory storage, reconditioning, handling warranties, etc.) that add another layer of costs to the property's value. 5 J. Bankr. L. & Practice 3, 11-18 (1995). When retailer costs are removed, retail and wholesale prices will tend to equalize. Id. Therefore, they conclude, wholesale prices, as opposed to retail prices, should be the best estimate of an asset's true worth because they strip away all the add-on's that have no relevance to the property's inherent value. Id. See also Jean Braucher, Getting It For You Wholesale: Making Sense of Bankruptcy Valuation of Collateral After Rash, 102 Dick. L. Rev. 763 (1998) (advocating that wholesale price of a car should be prima facie evidence of fair market value for chapter 13 cramdown purposes).

Judge Posner, writing of the relationship between wholesale and retail prices, has observed that valuation theory, properly applied, will dissolve the distinction between wholesale and retail prices. Contrail Leasing Partners v. Consolidated Airways, 742 F.2d

1095 (7th Cir. 1984). In a competitive market, the retail price *is* the wholesale price when the retailer's cost of business is removed. A rule that favors retail over wholesale prices for valuation purposes "would make no sense":

> [A]n ironclad rule against selling collateral at wholesale rather than retail would make no sense. Although retail prices tend to be higher than wholesale prices, this is because it costs more to sell at retail. Not only can there be, therefore, no presumption that the net gains to the seller are different at the two levels, but economic theory implies that returns at the two levels will tend toward equality, since until they are equalized dealers will have incentives to enter the level where the higher returns are being earned and by entering will bid those returns down.

742 F.2d at 1101; see also In re Ebbler Furniture and Appliances, Inc., 804 F.2d 87, 92 (7th Cir. 1986) (Easterbrook, J., concurring) ("In the retail business, the difference between the wholesale price and the retail price is the 'value added' of the business. It is the amount contributed by storing, inspecting, displaying, hawking, collecting for, delivering, and handling warranty on the goods. This difference covers the employees' wages, rent, and utilities of the premises, interest on the cost of good, bad debts, repairs, the value of entrepreneurial talent, and so on. The increment of price is attributable to this investment of time and other resources.").

Therefore, requiring an asset's fair market value to be determined only on the basis of retail prices will inflate its assessment. A willing buyer not under any compulsion to purchase would not pay retail prices for used switches where (as here) the seller was not offering services and benefits that are associated with retail sales (such as warranties, updated software, or reconditioning). The bankruptcy court's holding equating fair market value with retail prices is an erroneous conclusion of law that undermines and contradicts the willing seller and buyer test.

Echoing this concept, the U.S. Supreme Court, in <u>Associates Commercial Corp. v.</u> <u>Rash</u>, 520 U.S. 953 (1997), held that, if a retail price is chosen to determine the replacement value (i.e., the fair market value)[3] of certain property for chapter 13 cram-down purposes, deductions associated with a retailer's costs of business must be taken:

> [W]here the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicles, items such as warranties, inventory storage, and reconditioning.

<u>Rash</u>, 520 U.S. at 965 n.6.  <u>Rash</u> suggests that retail prices should not be used without significant deductions in determining the fair market value of property.  In other words, in the range of values that could serve as the basis to estimate the fair market value of property, an unadjusted retail price is not within the range of acceptable options.

By insisting that <u>only</u> retail sales should be used to value the Debtor's used switches, the bankruptcy court incorrectly precluded consideration of the strongest possible evidence of the value of those switches — the price the very switches themselves brought, in a sale following exposure to the marketplace, with multiple offers, and neither buyer nor seller under any compulsion to act, with the sale pending on the valuation date in question.

## V.    Bankruptcy Court Erred In Excluding the PwC Study

Mr. Schmitt testified that in forming his opinion he considered the PwC Study of the "Reconstruction Cost New" for fiber networks and that the PwC Study showed a RCN of $245 per fiber mile.  The PwC Study was Savvis's proprietary information, made available to the Trustee by Savvis.  Because it was non-public information of another

---

[3]    The U.S. Supreme Court held that its use of the term "replacement value" in the context of a chapter 13 cramdown "is consistent with the Ninth Circuit's understanding of the meaning of fair-market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." 520 U.S. at 959 n.2.

party, the Trustee took appropriate steps to use the PwC Study (which formed a basis for Mr. Schmitt's analysis of value), while protecting the non-public nature of the information by asking those Taxing Authorities who wished to review it to keep it confidential.

The bankruptcy court excluded the Trustee's expert testimony relating to the PwC Study, however, as "fundamentally flawed, based as it is on a confidential study, not presented in evidence, of Pricewaterhouse in conjunction with the 2004 sale of Debtors' bankruptcy assets to Savvis..." (A1973; A1745-46)   This is a misapplication of the evidentiary rules.

Under Federal Rule of Evidence ("FRE") 703, experts may use facts or data that are not admissible in evidence in forming their opinions, so long as such facts or data are of a type reasonably relied upon by experts in the particular field.  FRE 703; see also In re Art Shirt Ltd., Inc., 93 B.R. 333, 340-41 (E.D. Pa. 1988) (expert testimony concerning report admissible without report itself being admitted).   There is no dispute that a RCN analysis such as the PwC Study is information of a type routinely relied upon by experts in the appraisal field.   The fact that the PwC Study was not a public document in no way precluded an expert from relying on it.   The bankruptcy court had no basis to exclude testimony because it was based on non-public information.  (A1958-84; A1745-46)

Nor is there any ground under Rule 705 to exclude the testimony.   Under that rule, courts may require as a condition of admission of expert testimony the prior disclosure of facts or data on which the witness based his opinion.  FRE 705.  If the Trustee had kept its use of the PwC Study a secret, so as to prevent the Taxing Authorities from effectively cross-examining Mr. Schmitt about it, the bankruptcy court's exclusion of Mr. Schmitt's testimony might have been appropriate.  But that was not what happened here.

Mr. Schmitt's use of the PwC Study was a matter of public record after he submitted his affidavit in support of the Objections in March 2005. Mr. Schmitt also testified at his deposition concerning his analysis and his reliance on the PwC Study. When the subject of the PwC Study arose in the course of depositions prior to the hearings, all counsel who chose to participate in the depositions were affirmatively offered the opportunity by the Trustee to obtain all or any portion of the PwC Study, so long as they would agree to keep the information confidential. Copies of the PwC Study (or the requested portion) were provided to those who asked on that basis, all in advance of the hearing.[4] Counsel were thus free to use the PwC Study to cross-examine Mr. Schmitt if they chose to do so. Counsel for Orange County (the primary appellee here) <u>did</u> question Mr. Schmitt at some length about the PwC Study at the hearing. (A2024-28)

Moreover, the PwC Study (or at least its conclusion and general outline) was already familiar to the Taxing Authorities. Virtually all the Taxing Authorities accepted the valuations developed as a result of the PwC Study for purposes of calculating the Debtors' (and Savvis's) 2004 property taxes. (A701-02; A0768-69)

Accordingly, there was no proper basis to exclude Mr. Schmitt's testimony based on his reliance on the PwC Study. The exclusion of testimony on that basis was a fundamental misinterpretation of the requirements of Rules 703 and 705 and must be reversed. <u>In re Japanese Electronic Products</u>, 723 F.2d 238, 277 (3d Cir. 1983), rev'd on other grounds, 106 S. Ct. 1348 (1986) (court's misapplication of Rule 703 is reviewed for legal error, not abuse of discretion).

---

[4]    Subsequent to the May 5th hearing, the Trustee provided a portion of Mr. Schmitt's deposition transcript as evidence to the bankruptcy court that the Taxing Authorities had been offered an opportunity to review the full PwC Study, or relevant excerpts, as they chose. An attorney who alleged he had not seen the PwC study was mistaken; he had asked for a portion of the PwC Study after the deposition and was sent, via electronic mail, the portion he requested that same day (A1628-A1629, n. 8).

**VI.     The Bankruptcy Court Was Mistaken in Believing the
Testimony of the Trustee's Valuation Expert Was Inconsistent
with the Debtors' Prepetition Property Tax Renditions.**

At the hearing it was noted that the Trustee's expert had also been a prepetition property tax consultant to the Debtors from 1991-2003 and, in that capacity, had filed property tax "renditions" on their behalf. A "rendition" is the part of a taxpayer's tax return that lists the taxpayer's taxable property in a jurisdiction and certain information required by a particular jurisdiction relating to the property. The required items of information typically include such things as original cost, depreciation, net book value, or stock value if the taxpayer is a publicly traded company. Thus, the cost information provided in a rendition is submitted because a particular jurisdiction requires it. Most jurisdictions typically prefer to use the cost approach when initially determining tax, even where applicable law and practice allow for the use of alternative valuation methods.

For purposes of this appeal, the central point is that a rendition is not necessarily a declaration by the taxpayer of the fair market value of the particular property or any sort of endorsement by the taxpayer (or its tax accountant or consultant) of the cost approach to valuation of that property. Cost information is provided in a rendition because it has to be provided, not because the taxpayer necessarily believes the cost approach is the proper basis for determining taxable value.

The bankruptcy court's belief that the Trustee's expert had "flip-flopp[ed]" appears to stem from a simple misunderstanding of what a rendition is. It is evident that the bankruptcy court mistakenly thought that the expert's testimony that the market comparable approach was the most appropriate method to value the Debtors' switches and fiber as of January 2003 somehow contradicted the cost information included in renditions the same individual had filed on the Debtors' behalf as a prepetition tax consultant. No

such inference can be drawn from property tax renditions that include cost information. This erroneous belief led the bankruptcy court to discredit, wrongly, the reliability and credibility of the expert testimony central to the Trustee's case.

### VII.    Orange County's Use of the C. A. Turner Index to Develop Assessments Was Not Appropriate.

Orange County, Florida, presented Mr. Diffey, one of its property tax assessors, to explain its use of the C.A. Turner Index to develop assessments for the Debtors' used telecommunications equipment. Under cross-examination, Mr. Diffey conceded that the Index has numerous limitations and admitted to having reduced some assessments calculated using the index by as much as 40% to 60%. Yet the bankruptcy court accepted use of the Index as to the subject assets without any adjustment. This was clearly contrary to the evidence produced at the hearing.

First, Mr. Diffey explained that C.A. Turner, the company that develops the Index, routinely collects from major telephone companies information regarding what it would cost to replace used telecommunications equipment by purchasing new ones of the same make and model at retail. Under cross-examination, Mr. Diffey conceded that the index does not track what it would cost to purchase used telecommunications equipment, such as the Debtors' assets, in the open market. (A2050)

Second, Mr. Diffey also acknowledged that the Index does not account for economic obsolescence of used telecommunications equipment. (A2050) Economic obsolescence is a loss in value that results from external factors, such as a drop in demand for, or an oversupply of, used equipment in the market, that render a property obsolete, no longer competitive, unattractive to purchasers or investors, or of decreasing usefulness. In that connection, Mr. Diffey further acknowledged during the period 2001 to 2004 many

telecommunications companies with property in Orange County went bankrupt, went out of business, or were acquired, and that in 2004 he had to reduce some assessments calculated from the C.A. Turner Index by as much as 40% to 60% to account for economic obsolescence. (A2051; A2055-57)

Mr. Diffey further admitted that Orange County (like every other Taxing Authority here) accepted the price obtained by the Debtors in the January 2004 sale to Savvis as evidence of the fair market value in 2004 of the subject property because it was a commercially reasonable sale that satisfied the willing seller/buyer test. (A2058-60) In fact, he adjusted downward his assessment of the fiber from approximately $1.35 million in 2003 (calculated using the C.A. Turner Index) to $75,000 for 2004 (calculated using the Savvis sale and the PwC Study) — an adjustment of over 90%. (A0687)

Therefore, despite the fact that the testimony established that the C.A. Turner Index is inapplicable to used telecom equipment and does not account for the economic obsolescence that forced Mr. Diffey to reduce his assessment of the Debtor's property by as much as 90% in 2004, the bankruptcy court still found the C.A. Turner Index, without any adjustment, was a valid estimation of the fair market value of the Debtor's property just a year earlier. This finding can only be justified if there is evidence that there was a market downturn between 2003 and 2004 that could account for the 90% adjustment. Yet, the unrebutted testimony of the Trustee's expert is that the value of used telecommunications equipment remained stable from 2003 to 2004. Even if the bankruptcy court disregarded Mr. Schmitt's expert testimony as to the stability of market conditions over that year, no evidence exists to support a finding of a market downturn to justify the 90% adjustment

just a year later. Since the bankruptcy court's finding regarding the C.A. Turner Index cannot be reconciled with the evidence, it was clearly erroneous.

## CONCLUSION

For the foregoing reasons, the Court should reverse or vacate the bankruptcy court's order denying the Trustee's Fifteenth and Sixteenth Omnibus Objections.

Dated:    September 5, 2006                Respectfully submitted,
          Wilmington, Delaware

                                           WINSTON & STRAWN LLP
                                           Eric E. Sagerman
                                           Rolf S. Woolner
                                           333 South Grand Avenue, 38th Floor
                                           Los Angeles, California 90071
                                           Telephone: (213) 615-1700
                                           Facsimile: (213) 615-1750

                                           WINSTON & STRAWN LLP
                                           Brian Y. Lee
                                           101 California Street
                                           San Francisco, California 94111
                                           Telephone: (415) 591-1000
                                           Facsimile: (415) 591-1400

                                                 -and-

                                           YOUNG, CONAWAY, STARGATT &
                                           TAYLOR, LLP

                                           Robert S. Brady (No. 2847)
                                           Edmon L. Morton (No. 3856)
                                           Margaret B. Whiteman (No. 4652)
                                           The Brandywine Building
                                           1000 West Street - 17th Floor
                                           P.O. Box 391
                                           Wilmington, Delaware 19899
                                           Telephone: (302) 571-6600
                                           Facsimile: (302) 571-1253

                                           Co-Counsel for AlixPartners, LLC as
                                           Trustee of the Omega Liquidating Trust

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2006, I caused a copy of the foregoing Appellant's

Opening Brief to be served upon the following parties in the manner indicated:

Michael D. DeBaecke, Esquire
Blank Rome Comisky & McCauley, LLP
1201 Market Street,  Suite 800
Wilmington, DE 19801
(Orange County, FL)
***Hand Delivery***

Peter Froelicher
310 West 19th Street, Suite 320
Cheyenne, WY 82001
Laramie County
***First Class Mail***

Cathy Prather
Chief Deputy Treasurer
County of Otero
1000 New York Ave., Room 110
Alamogordo, NM 88310
***First Class Mail***

Lee Virorel
901 St. Louis Street, 20th Floor
Sprinfield, MO 65086
(Montgomery & Warren Counties)
***First Class Mail***

Dated: September 5, 2006
       Wilmington, Delaware

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Sean T. Greecher (No. 4484)
Margaret B. Whiteman (No. 4652)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

062838.1001

WINSTON & STRAWN LLP
Eric E. Sagerman
Rolf S. Woolner
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

WINSTON & STRAWN LLP
Keith A. McDaniels
Todd J. Dressel
101 California Street
San Francisco, California  94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

*Counsel to the Omega Liquidating Trust*